

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 8, 2022

**BY ECF**

The Honorable Andrew L. Carter, Jr.
United States District Court Judge
Southern District of New York
40 Foley Square
New York, New York 10007

**Re: *United States v. Ronald Romano*, 20 Cr. 585 (ALC)**

Dear Judge Carter:

The defendant in the above-captioned case is scheduled to be sentenced on September 15, 2022, at 3:30 p.m. The Government respectfully submits this letter in connection with sentencing and in response to the defendant's September 1, 2022 sentencing memorandum ("Def. Mem.").

This criminal case arises from the defendant's attempt to exploit one of the worst public health crises in generations. In March 2020, when New York City ("NYC" or the "City") was the epicenter of the emerging COVID-19 pandemic and in a state of crisis, the defendant attempted to profit by price gouging the city in the sale of critically needed personal protective equipment ("PPE"). Fortunately, the defendant's scheme failed, and the City ultimately secured PPE from legitimate vendors. While the defendant did not get the riches he sought, there will be future disasters and fraudsters who seize the opportunity to get rich quick. The Court can and should send a message to those who, like the defendant, would use a public emergency to line their pockets through deceptive and unlawful means. For the reasons that follow, the Government respectfully submits that a term of incarceration within the stipulated United States Sentencing Guidelines ("U.S.S.G.") range of zero to six months is warranted.

## I. Offense Conduct

### *A. The Global COVID-19 Pandemic*

Towards the end of 2019, there was public reporting of a novel coronavirus, within the Wuhan Province of the People's Republic of China, causing the coronavirus disease 2019 ("COVID-19"). Individuals with COVID-19 can have a wide array of symptoms, including: cough, shortness of breath, fever, chills, muscle pain, sore throat, and/or loss of taste or smell. As of September 2022, the World Health Organization has reported more than 6 million deaths from COVID-19.[1] (PSR ¶ 19(a).)

[1] https://covid19.who.int/ (last visited September 8, 2022).

While public health officials initially disputed the means through which the virus that causes COVID-19 is spread, the Centers for Disease Control (the "CDC") ultimately concluded that the virus is spread through respiratory droplets produced when an infected person coughs or sneezes. Accordingly, towards the end of March 2020 and in the beginning of April 2020, federal, state, and local health officials began recommending masks for all people over the age of two. The CDC issued guidance recommending the use of face coverings to prevent the spread of the virus. Likewise, on or about April 15, 2020, the then-New York Governor issued an executive order requiring all people in New York to wear face coverings in public. (PSR ¶ 19(b).)

By March 2020, NYC became the epicenter of COVID-19 within the United States, having far more positive cases and deaths than any other state or region in the Country. (PSR ¶ 19(c); Jesse McKinley, *Officials Race to Stem Outbreak As New York Becomes Epicenter*, The New York Times, (Mar. 23, 2020), at 1.) The rapid spread of COVID-19 across the country and the New York metropolitan area threatened to overwhelm the provision of healthcare services in the Nation generally and New York specifically. To that end, federal and state officials in New York and metropolitan area hospitals took extraordinary steps to meet the critical need to treat those infected, including the creation of makeshift hospitals. (PSR ¶ 19(d); Nelson D. Schwartz, *A Race To Deliver Critical Supplies To Medical Teams*, The New York Times, (Mar. 22, 2020), at 1.)

***B. The Defense Production Act***

To address the national emergency caused by the spread of the novel coronavirus, on or about March 18, 2020, the President of the United States issued Executive Order 13909, which invoked the powers of the Defense Production Act of 1950, 50 U.S.C. §§ 4501 et seq. (the "Defense Production Act" or the "Act"). Among other things, the Act authorizes the President to "allocate materials . . . in such a manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense. *Id*. at 4511(a)(2). Under the Act, the President may control the "general distribution of any material in the civilian market" upon a finding: "(1) that such material is scarce and critical material essential to the national defense, and (2) that the requirements of the national defense for such material cannot otherwise be met without creating a significant dislocation of the normal distribution of such material in the civilian market to such a degree as to create appreciable hardship." *Id*. at 4511(b). (PSR ¶¶ 26-27.)

To prevent the hoarding of scarce and critical materials during a national crisis, the Act provides that "no person shall accumulate (1) in excess of the reasonable demands of business, personal, or home consumption, or (2) for the purpose of resale at prices in excess of prevailing market prices, materials which have been designated by the President as scarce materials or materials the supply of which would be threatened by such accumulation." (PSR ¶ 28.)

The President delegated authority to the Secretary of Health and Human Services ("HHS") to identify specific health and medical resources that meet the criteria under the Act. On March 25, 2020, HHS exercised such authority and published a notice, *see* 85 Fed. Reg. 17592, designating the following health and medical resources, among others, under the Act as scarce materials or materials the supply of which would be threatened by the accumulation in excess of reasonable demands for the purpose of resale at prices in excess of prevailing market prices: (i) N95 filtering facepiece respirators; (ii) other filtering facepiece respirators (*e.g.*, those designated

as N99, N100, R95, R99, R100, or P95, P99, P100), including single-use, disposable half-mask respiratory protective devices that cover the user's airway (nose and mouth); (iii) PPE facemasks, including any masks that cover the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels; (iv) PPE surgical masks; and (v) PPE face shields. (PSR ¶ 29.)

### *C. The Demand for N95 Respirators*

Due to the combination of the highly transmissible nature of the novel coronavirus and the unprecedented demand for emergency medical services to treat patients presenting with COVID-19 symptoms, hospitals and medical professionals have experienced critical shortages of PPE, such as one-time usage facemasks. PPE was and still is necessary to protect medical professionals and first responders who are on the frontline battling the global COVID-19 pandemic. (PSR ¶ 30.)

By March 2020, it was widely reported that healthcare providers and first responders, including police departments and fire departments, faced critical shortages of PPE, including face respirators. Because of New York's critical shortage of certain PPE and the exponential demand, New York authorized the State's National Guard to seize unused PPE from private health care organizations and place them in hospitals that needed them the most in NYC. (PSR ¶ 31.)

3M-brand N95 respirators were generally a sought-after brand of respirators by healthcare providers and state and local governments. 3M's N95-rated filtering respirators have a filtration efficiency of at least 95% against non-oily particles. Notwithstanding this surging demand, 3M did not increase the prices that it charged for 3M-brand N95 respirators. 3M's per-respirator suggested retail price, *i.e.*, list price, for 3M-brand models 1860 and 8210 respirators are $1.27 and $1.02-$1.31, respectively. (PSR ¶¶ 32-33.)

3M sells its safety products through authorized distributors. 3M controls the distribution of its safety products to ensure that its authorized distributors adhere to strict quality-control standards, given that consumers rely on the efficacy of 3M's products for their health and safety. Thus, 3M vets its potential authorized distributors and controls the distribution of its products through authorized distribution agreements. 3M does not authorize third parties to manufacture its products, and authorized distributors must acquire 3M products directly from 3M. (PSR ¶ 34.)

None of the defendant, his company (Performance Supply LLC ("Vendor-1")), or the defendant's associates were authorized to sell 3M-brand products. (PSR ¶ 35.)

### *D. The Scheme Begins*

Beginning in or about February 2020, the defendant and others, including his business associate ("CC-1") and his friend and business associate ("CC-2"), commenced efforts to obtain for resale large quantities of PPE, including N95 respirators. As described below, the potential sources of PPE included a Mexico-based company, a "hedge fund" associated with CC-2, a Peruvian-based exporter, and 3M itself. (PSR ¶ 36.)

The defendant and CC-2 discussed that they could get rich quick by closing a sale of respirators. On March 9, 2020, the defendant sent a message to CC-2, stating, "I'm working on a few deals that if I get any of them you might be buying a Ferrari." (PSR ¶ 37.)

Starting in or about February 2020, the defendant's friend and business associate, CC-2, began negotiating with a Mexico-based company to purchase, for purposes of resale, face coverings and other PPE, and the defendant and CC-2 had an ongoing dialogue about obtaining PPE from various sources. In turn, the defendant, among others, attempted to sell the PPE sourced by CC-2. To that end, in or about March 2020, the defendant contacted another business associate ("CC-3"), whom the defendant met a few years prior, and asked CC-3 to sell face respirators sourced by the defendant. The defendant and CC-3 agreed that CC-3 would receive a 25-cent commission per mask sold through CC-3's efforts. (PSR ¶ 38.)

On March 2, 2020, the defendant emailed CC-3, "here are the specs for the mask[s] we have available." The defendant listed prices ranging from $4.01 to $4.11 per respirator. Later that day, CC-3 responded to the defendant's email, stating in part, "WOW!! I just saw the prices. They are outrageous on a per mask basis. The N95 mask I sent you in the last e-mail with a valve is only $1.95 per mask. And you want to charge over $4?" Shortly after sending this email, CC-3 sent the defendant another email expressing astonishment over the pricing: "Look, I really have a problem with the pricing. It's one thing to charge (as [CC-1] told me last night) 25-30% more than the usual price -- but here you are charging around 260%. . . . I feel like the prices you have sent me are taking advantage of people." Nonetheless, CC-3 attempted to sell these respirators on the defendant's behalf. (PSR ¶ 39.)

Based on a review of emails collected during the investigation, the defendant and others attempted to sell the Mexican-made PPE facemasks at prices marked up between approximately 250% and 1,100%. (PSR ¶ 40.)

***E. The Purported Hedge Fund Sourced Respirators***

On March 12, 2020, the defendant's close friend and business associate, CC-2, emailed the defendant and others about a purported opportunity to acquire up to 400 million 3M-brand respirators. The email stated that a purported hedge fund (the "CC-2 Hedge Fund"), with a name similar to another entity controlled by CC-2 ("CC-2 Company-1"), "has secured the rights to manufacture . . . with 3M factories 3M N95 NIOSH particulate respirator Models 1860 and 8210, with a cap amount of *400 million units worldwide*." CC-2 offered per-mask prices of $5.20 and $5.50 for 3M models 8210 and 1860, respectively, on orders of at least 5 million. (PSR ¶ 41.)

The CC-2 Hedge Fund appears to be a fictitious entity. 3M never agreed to manufacture respirators for the CC-2 Hedge Fund, and CC-2 (and his entities) were not authorized to distribute 3M products or solicit purchase orders from prospective customers on behalf of 3M. (PSR ¶ 42.)

In the days that followed, the defendant (with the assistance of CC-2) created a document on CC-2 Company-1's letterhead, stating that the defendant's company, Vendor-1, was authorized to sell 3M products on CC-2's company's behalf (the "Fictitious Authorization Letter"). On or about March 15, 2020, the defendant emailed CC-2 a draft of the Fictitious Authorization Letter.

The body of the email stated, "Make changes if needed." The draft document that the defendant had prepared stated:

> [The CC-2 Hedge Fund] has secured the rights to manufacture 400 million Units (Masks) with 3M factories in the US. 3M will produce the N95 NIOSH particulate respirator Models 1860 and 8210 FOB 3M factories.
>
> This letter represents that [Vendor-1] is an authorized agent to represent our products around the world, to take and accept orders, deposits, and payment through their business operations headquartered in Manalapan NJ USA.
>
> All orders are subject to inventory availability's [sic] to be confirmed by [Vendor-1]. All Purchase orders, deposits, payments, and or letters of credit are to be secured with Performance Supply.
>
> [Vendor-1] will monitor each order and provide details and confirmations of manufacturing so shipping arrangements can be made for delivery. [Vendor-1] represents the pricing on each product, in USA dollars.

(PSR ¶ 43.) The following day, on or about March 16, 2020, CC-2 emailed the defendant a signed copy of the Fictitious Authorization Letter on CC-2 Company-1 letterhead. CC-2's spouse signed as the "President" of CC-2 Company-1. (PSR ¶ 44.)

### *F. The Defendant Begins Attempts to Sell 3M-Brand Respirators*

At or around the same time that the defendant created the Fictitious Authorization Letter, the defendant began in earnest his efforts to sell 3M-brand respirators to multiple buyers, even though he was not an authorized 3M distributor and he knew or had reason to know that CC-2 Company-1 and the CC-2 Hedge Fund had no ability to procure face respirators from 3M. For example, on or about March 16, 2020, the defendant sent an email to CC-1 stating, in substance and in part, that CC-1 could submit the Fictitious Authorization Letter to potential buyers. (PSR ¶ 45.)

Likewise, the defendant told CC-3 in or about mid-March, in substance and in part, that the defendant could obtain up to 400 million 3M-brand face respirators from a "hedge fund" that had purportedly preordered 400 million face respirators from 3M. Thus, on or about March 14, 2020, the defendant sent an email to CC-3, stating in part, "Our situation has changed, our partners have secured a commitment for 400 million masks from 3M." A few days later, on or about March 17, 2020, the defendant emailed the Fictitious Authorization Letter to CC-3 but redacted the name of the CC-2 Hedge Fund, *i.e.*, the entity that purportedly had a contract with 3M to manufacture 400 million respirators, in an apparent effort to conceal CC-2's association with the entity that claimed to have rights to manufacture 3M "masks" with 3M factories. (PSR ¶ 46.)

CC-3 told the defendant that the Fictitious Authorization Letter was "good -- but not great. It really needs to be dated and it should have an expiration date (say 1 year)." On March 17, 2020,

the defendant emailed CC-3 a revised version of the Fictitious Authorization Letter, which had been backdated to March 2, 2020 and listed a March 2, 2021 expiration. (PSR ¶ 47.)

On or about March 18, 2020, CC-3 introduced the defendant to Broker-1 and Broker-2 for the purpose of selling face respirators sourced by the defendant. CC-3 stated in an email to Broker-1 and Broker-2 that the defendant had "enormous contracts both with 3M and another company with a plant in Mexico" to manufacture face respirators. (PSR ¶ 48.)

Thereafter, Broker-1 and Broker-2 attempted to sell PPE facemasks on the defendant's behalf. On or about March 19, 2020, Broker-1 sent an email to the City offering to sell certain PPE facemasks on behalf of Vendor-1. In particular, Broker-1 offered, among other things, 2-layer pleated masks and 3-layer pleated masks. The defendant and Vendor-1 attempted to sell PPE facemasks to the City at prices marked up between 390% and 1,129% from the manufacturer's prices. (PSR ¶ 49.)

Broker-1 also informed NYC's Office of Citywide Procurement that Vendor-1 could sell a large volume of 3M-brand face respirators, conveying to NYC several of the defendant's materially false statements, including that Vendor-1 had a relationship with a hedge fund that had a contract with 3M to obtain 400 million face respirators and that the respirators would be manufactured in the United States. In reality, Vendor-1 had no ability or authority to procure or sell 3M-brand face respirators. (PSR ¶ 50.)

While Broker-1 and Broker-2 negotiated with NYC on the defendant's behalf, CC-3 continued to express concerns about the defendant's pricing, but the defendant refused to adjust prices. On March 22, 2020, at approximately 5:58 p.m., the defendant sent a text message to CC-3, stating in part, "I think we are finally at a point of desperation where institutions and governments are willing to consider our pricing." On March 25, 2020, which, as described below, was the same day that Vendor-1 submitted its initial formal quote to NYC to provide NYC with N95 respirators, CC-3 sent an email to Broker-1 that (again) expressed alarm about the defendant's pricing: "I'm really cringing over the prices. I'm worried about allegations of price gouging especially with all the emphasis that has been placed on this concept by the government in their communications with the citizens. . . . Although I believe you know me to be an optimist, I would be scared to send this out." (PSR ¶ 51.)

The defendant also appeared concerned about price gouging and, in particular, the Defense Production Act. On March 22, 2020, the White House held a press conference, starting at approximately 5:55 p.m., to discuss, among other things, the Act. The speaker explained that the Act authorizes the President to regulate scarce resources, "both from the supply chain to the manufacturers, and from the manufacturers to the end users, such as the healthcare professionals." The speaker remarked that he had received "a lot of calls" about hoarding that were "very disquieting." The speaker noted that "[b]rokers are offering millions of items, whether goggles, masks, or whatever. And you go through three different brokers, tracking to a warehouse in LA that's allegedly got 10 million masks and they might charge you seven times what they cost. That's price gouging." (PSR ¶ 52.)

On or about March 22, 2020, starting at approximately 6:30 p.m., *i.e.*, approximately thirty-five minutes after the White House press conference began, the defendant and CC-2 exchanged the following text messages:

| | |
|---|---|
| ROMANO: | Trump press conference not promising for us |
| CC-2: | What did they say |
| ROMANO: | Going after brokers. If your [sic] hoarding medical supplies come forward with fair price and they will pay. If not we will get you |
| CC-2: | We are not hoarding we are producing and selling as produced |
| ROMANO: | I know. So can we still produce 3m? |
| CC-2: | Waiting for contract |

(PSR ¶ 53.)

### G. *The Defendant Causes the Submission of Numerous False and Misleading Formal Quotes to NYC for 3M Face Respirators.*

On March 24, 2020, CC-3 sent a text message to the defendant, stating in part, "Ron! Good morning! We are very close to a 5 million order from New York City!!!!" In a subsequent text message, CC-3 asked the defendant "urgently" to call Broker-1 and Broker-2 because "NYC wants best and final prices." The defendant and Broker-1 then worked together to submit to NYC an IRS Form W9, which listed Vendor-1 as the seller and was signed by the defendant.

On March 25, 2020, at approximately 10:03 a.m., NYC requested a formal quote for five million 3M-brand model 1860 face respirators and two million 3M-brand model 8210 face respirators. According to Broker-1, NYC would issue a purchase order if it agreed to the terms of the formal quote.

On March 25, 2020, at approximately 12:44 p.m., CC-3 emailed the defendant and CC-1 a draft formal quote for their review. Approximately one hour later, the defendant emailed CC-3 a signed copy of the formal quote (the "First Formal Quote"). At approximately 2:07 p.m., Broker-1 emailed the First Formal Quote to NYC.

Through the First Formal Quote, Vendor-1 stated that it would sell the respirators for $6.33 per "mask" for two million 3M 8210 respirators and for $6.65 per "mask" for five million 3M 1860 respirators, for a total of $45,910,000. The investigation revealed that, in at least one instance, the defendant attempted to source these respirators from 3M directly. (PSR ¶¶ 54-56.) 3M has not raised its prices during the COVID-19 pandemic. Thus, the defendant attempted to sell 3M respirators to NYC at more than a 400% markup.

The First Formal Quote further provided that "payment in full must be made before shipping," that the 3M respirators would be manufactured in the United States, and that "acceptance of the purchase order is at the full discretion of 3M and supplies are based upon availability. The N95 masks from 3M can be produced at any of 3 plants in the USA according to their manufacturing schedule." Vendor-1 was not authorized to solicit purchase orders from customers for submission to 3M for approval. Nor was Vendor-1 authorized to state how, where, or in what quantity such orders would be filled. Also, 3M does not accept purchase orders from unauthorized distributors. Through submission of the First Formal Quote (and the formal quotes that followed), the defendant implied a relationship with 3M that did not exist. A supervisor at NYC's Office of Citywide Procurement ("City Employee-1") responsible for the potential transaction with Vendor-1, told law enforcement, in substance and in part, that City Employee-1 believed that Vendor-1 had a legitimate business relationship with 3M based on Vendor-1's submissions to NYC. City Employee-1 was also particularly interested in a potential deal with Vendor-1 because the respirators were asserted to be manufactured in the United States, which indicated a quicker delivery time.

After receiving the First Formal Quote, NYC responded, in substance and in part, that NYC does not issue purchase orders that provide for payment before delivery. After NYC responded, CC-3 sent a text message to the defendant, stating in part, "Could you please call [Broker-1 and Broker-2] they want to discuss . . . what they learned regarding payment terms and to strategize."

On or about March 26, 2020, Broker-2 emailed a revised formal quote (the "Second Formal Quote") to NYC's Office of Citywide Procurement. The payment terms were revised to state that "[p]ayment must be made upon receipt of Each shipment Net 15 days." At the same time, Broker-2 submitted Technical Specification Sheets for both models of 3M-brand N95 respirators that Vendor-1 purported to have available for sale. 3M's famous design mark appeared throughout both Technical Specifications, inferring a relationship between 3M and Vendor-1 that did not exist.

Between approximately March 26 and March 31, 2020, Broker-1 and Broker-2 continued to correspond with NYC on behalf of the defendant about the sale of 3M respirators. At no time during this period did the defendant disclose that Vendor-1 had no ability or authorization to sell 3M face respirators. During this time period—while NYC was facing an unprecedented crisis and in desperate need of PPE for its healthcare workers and first responders—NYC expended employee time and resources in attempting to purchase 3M respirators from Vendor-1, time and resources that could have been directed towards legitimate suppliers.

On or about March 30, 2020, City Employee-1 emailed Broker-1 in substance and in part, "As discussed, if you can get both masks 8210 and 1860 in the less than $6 price point, that will greatly enhance the chances that this gets approved. So if you could revise the quote with your best and final offer that will be greatly appreciated."

After consulting with the defendant, on or about March 31, 2020, Broker-1 emailed NYC another revised formal quote (the "Third Formal Quote"). Through the Third Formal Quote, Vendor-1 stated that it would sell the respirators for $6.05 per "mask" for two million 3M 8210 respirators and for $6.35 per "mask" for five million 3M 1860 respirators, for a total of

$43,850,000. This "best and final offer" represented an approximately 380% markup from the 3M list price.

Later that evening, on or about March 31, 2020, at approximately 9:29 p.m., CC-3 sent an email to the defendant and Broker-1 stating in part, "I just heard from someone who knows well that anyone caught selling masks at or about $6.50 will face an FBI investigation." The defendant responded, "They should investigate who is paying it. I thought we are a free market of supply and demand? We are not the manufacturer price gauging [sic]. we are a buyer and seller marking up about 20 to 25% from OEM price with multiple costs, Not illegal or enforceable." But, as alleged herein, the manufacturer, 3M, did not raise its prices, and the defendant attempted to mark up the prices significantly more than 25% from the list price.

### *H. The Defendant Causes the Submission of False and Misleading References to NYC*

During the COVID-19 crisis NYC suspended its usual practice of procuring goods and services only from approved vendors. Given the City's immediate and critical need for PPE, it received bids and quotes from never-before-used vendors, such as Vendor-1. However, NYC required new vendors to provide references.

On March 31, 2020, at approximately 1:16 p.m., NYC sent an email to Broker-1 requesting "3 references that we may contact to verify delivery, responsiveness, etc." After receiving this email, Broker-1 notified the defendant. Following NYC's request for references from Vendor-1, the defendant engaged in discussions with others reflecting his reluctance to submit references and efforts to deceive and make false statements to the City. (PSR ¶ 70.)

On March 31, 2020, at approximately 6:08 p.m., the defendant texted CC-3: "I'm not sure when we actually have to give them these references so I'm holding out for now." Approximately twenty minutes later, CC-3 left the defendant a voice message, stating in substance and in part, "I thought the references were the last step to getting the purchase order." Several minutes later, CC-3 forwarded to the defendant a text message from Broker-1, stating in part, "I need 3 references of companies that [Vendor-1] has sold masks to, as proof due to the massive fraud going on. They will not issue the PO without the references, so the sooner we receive it, the better." Approximately ten minutes later, the defendant responded, "Ok will send later tonight." (PSR ¶ 71.)

Later in the evening of on or about March 31, 2020, the defendant and CC-3 discussed, in substance and in part, using CC-1 as a reference for Vendor-1, despite the fact that CC-1 was the defendant's business associate and the Vice President for Global Sales at Vendor-1. On or about March 31, 2020, at approximately 8:47 p.m., the defendant sent a text message to CC-1, stating in part, "I may need to list has [sic] a reference for NYC PO that we did business." (PSR ¶ 72.)

On March 31, 2020, at approximately 8:47 p.m., CC-3 sent a text message to the defendant, stating in part, "Did you see the email? NYC specifically says what questions will be asked—so you will need to prep them and agree with the answers." (PSR ¶ 73.)

On March 31, 2020, at approximately 9:29 p.m., Broker-1 sent a text message to the defendant and CC-3, stating in part, "Hi Ron don't forget the 3 references." Approximately one minute later, the defendant responded, "What questions are they going to ask? Will they definitely call?" Broker-1 responded, in part, "Maybe their [sic] just want to make sure [Vendor-1] has sold to other companies." "[They need] Name of Company Contact Name Contact Number Service Provided Contract Amount." "Again their [sic] is a lot of fraud going on so their [sic] want to make sure [Vendor-1] has sold to other buyers." (PSR ¶ 74.)

On March 31, 2020, at approximately 11:37 p.m., Broker-1 sent the defendant a text message, stating in part, "Ron are you still up to send the 3 references?" (PSR ¶ 75.)

On March 31, 2020, at approximately 11:46 p.m., the defendant emailed CC-3 and Broker-1 a document that listed references for Vendor-1 (the "References Document"). The References Document listed three references: (1) a Purchasing Agent for the Florida Division of Emergency Management (the "FDEM"); (2) a naturopathic medical university (the "Medical University"); and (3) CC-2 and CC-2 Company-1. (PSR ¶ 76.)

The three references listed on the References Document were materially false and misleading. First, the References Document listed a $5,460,000 sale of three million facemasks to the FDEM. The individual listed on the References Document as the "Purchasing Agent" of the FDEM is not an employee, agent, or representative of FDEM; rather, that person, Broker-3, was a broker who attempted to sell respirators to the FDEM on the defendant's behalf. Also, Vendor-1 never sold respirators to the FDEM. Rather, as set forth below, Vendor-1 attempted to sell respirators to the FDEM via Broker-3 but ultimately was unable to procure financing. Second, the References Document falsely stated that Vendor-1 had sold $123,600 worth of 5-ply surgical masks to the Medical University. The defendant sold face coverings to the Medical University for approximately $12,000 (not $123,000), and, according to the Medical University, those face coverings appeared to be of such inferior quality that the Medical University did not distribute them. Third, the References Document indicated that Vendor-1 supplied CC-2 and CC-2 Company-1 with 3-ply face respirators. This representation was false. The investigation revealed no evidence that the defendant supplied respirators to CC-2 or CC-2 Company-1. To the contrary, the defendant attempted to acquire respirators *from* CC-2. (PSR ¶ 77.)

On April 1, 2020, at approximately 11:54 a.m., CC-3 emailed the References Document to NYC on the defendant's behalf. (PSR ¶ 78.)

On April 1, 2020, at approximately 12:05 p.m., the defendant emailed CC-2 a copy of the References Document, and wrote in the body of the email, "In case they call on the reference." Subsequently, NYC personnel contacted CC-2, whom the defendant had listed on the References Document. NYC personnel notes from that call indicate that CC-2 stated, in substance and in part, "CC-2 has worked with [Vendor-1] for numerous orders in the past for surgical masks and medical supplies. CC-2 advised that [Vendor-1] is straight forward, delivers on time and that product meets expectations." For the reasons set forth above, CC-2's statements to NYC appear to have been materially false and misleading. (PSR ¶¶ 79-80.)

On April 1, 2020, City Employee-1 asked Broker-1 to furnish documentation from 3M authorizing the distribution of the respirators that were the subject of the proposed sale. "All of the paper work must be above board and able to be verified." Later that day, Broker-1 forwarded this email to CC-3 and the defendant. CC-3 responded, "Yikes." (PSR ¶ 81.)

In the days that followed, the defendant discussed with CC-3, among others, the possibility of obtaining up to 100 million 3M-brand respirators from a Peru-based exporter. Between April 1 and April 2, 2020, the defendant sent CC-3, among other things, a "proforma invoice" purporting to reflect the sale of 100 million 3M-brand respirators from 3M in the Netherlands to a Peru-based exporter, and a contract between an entity associated with CC-2 and the Peruvian export company. The contract was for the sale of 100 million 3M model 8210 face respirators. These documents were fictitious. Among other things, the "proforma invoice" listed a non-existent 3M legal entity and incorrectly stated that the respirators would be manufactured in Uruguay when, in fact, 3M does not manufacture respirators in Uruguay. (PSR ¶ 83.)

On April 3, 2020, the defendant suggested sending the pro forma invoice to NYC. At or about the same time, the defendant was questioning the authenticity of the invoice and the contract. Thus, on or about March 31, 2020, CC-2 emailed the defendant a link to a website that warned that the Peruvian exporter was a "scammer." In an April 4, 2020, text message to CC-2, the defendant stated, "I haven't believed anyone. Not even our guy in Peru lol. . . . We need to verify orders." Notwithstanding the defendant's concerns about the Peruvian exporter, on April 1 and 2, 2020, the defendant forwarded the "proforma invoice" and contract with the Peruvian exporter to CC-3. (PSR ¶¶ 84-87.)

On April 6, CC-2, Broker-1, and Broker-2 ended their business efforts with the defendant.

### *I. The Defendant's Efforts to Price Gouge Florida Public Health Officials*

In addition to the defendant's fraudulent efforts to gouge NYC, the defendant similarly attempted to gouge a government agency in Florida—the FDEM. In March 2020, CC-3 connected the defendant with an attorney and broker based in Miami (the "Florida Broker") for the purpose of selling PPE facemasks sourced from the same Mexico-based manufacturer referenced above.

On or about March 27, 2020, Broker-3 sent an email to FDEM offering to sell "5 million, 3-ply masks (specs attached) FOB Laredo, Texas. Price $1.80/mask (quote attached)." The formal quote attached to this email described the facemasks as "3-ply N99 masks" and stated that the facemasks "were manufactured at a factory in Mexico City and were brought to a warehouse in Laredo, Texas on Thursday, 26 March."[2] The formal quote was on Vendor-1's letterhead. (PSR ¶ 90.)

[2] The formal quote appears to have been false insofar as it stated that the N99 facemasks were in Texas as of March 26. On or about March 28, 2020, CC-3 sent a text message to the defendant and Broker-3 explaining, based on information that CC-3 appeared to obtain from the defendant, that "the masks are in transit to Laredo from the factory. It is a 700 mile 13 hour trip." That the PPE be physically present in the United States was apparently important to the FDEM. In a March 28, 2020, email from CC-3 to Broker-3, CC-3 stated in part, "They were not interested or

After several days of negotiations with the FDEM, on or about March 29, 2020, Broker-3 submitted a revised formal quote, at the direction of the defendant, for 3 million N99 facemasks, $1.82 per mask, for a total sale price of $5,460,000. This represented a 500% markup from the price that the defendant and CC-2 were obtained to obtain these facemasks from their source-of-supply, the Mexico-based manufacturer. (PSR ¶ 92.)

On or about March 30, 2020, the FDEM issued a purchase order for three million 3-ply N99 facemasks for $5,460,000. The defendant and Vendor-1 were unable to deliver these facemasks, however, because they could not arrange for financing. Nevertheless, as noted above, the defendant listed the failed FDEM transaction among the fraudulent references submitted to NYC. (PSR ¶ 93.)

***J. The Defendant Defrauded and Price Gouged a Medical University in Washington***

On about March 20, 2020, the defendant (through his company, Vendor-1) sold 4,000 facemasks to the Medical University, which were intended to be distributed to staff and students. The Medical University understood the order to be for "5-ply," virus-protection respirators, pleated with elastic ear loops. On or about April 22, 2020, the Medical University appeared to have received something very different. It received the face coverings in packaging that stated, "For general everyday protection only. NOT Reusable THIS IS NOT A MEDICAL DEVICE, NOT FOR RESALE." The face coverings were not pleated and did not have elastic ear loops.

Following delivery, the Medical University inquired as to the specifications of the face coverings. The defendant emailed the Medical University a document (the "Specification Document") stating that the face coverings were "5-ply." But, based on a review of the defendant's emails, it appears that the original version of the Specification Document indicated that the face coverings were "3-ply." Ultimately, the Medical University attempted to return the face coverings because staff did not believe they were safe for their intended use. The defendant charged the Medical University approximately $12,360 for these face coverings, a markup of approximately 360%.

## II. Procedural History

On May 21, 2020, the Government filed a complaint that charged the defendant in three counts: Count One charged the defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. Count Two charged the defendant with substantive wire fraud, in violation of 18 U.S.C. § 1343. Count Three charged the defendant with conspiracy to violate the Defense Production Act, in violation of 18 U.S.C. § 371 and 50 U.S.C. § 4512. Romano was arrested on May 26, 2020 and was released from custody the same day subject to certain conditions.

Indictment 20 Cr. 585 (ALC) was filed on October 27, 2022, charging the defendant with the same crimes alleged in the complaint. (PSR ¶¶ 1-4.)

---

responsive to inventory not present in the US last time."

On May 31, 2022, the defendant pled guilty, with the benefit of a plea agreement, to Count Three of the Indictment. In the plea agreement, the parties stipulated that the adjusted offense level is four and that the defendant is in Criminal History Category I. Accordingly, the parties agreed that the applicable Guidelines range is zero to six months' imprisonment (the "Stipulated Guidelines Range"). (PSR ¶ 7.)

On August 22, 2022, the Probation Office submitted the final PSR and a sentencing recommendation. The Probation Office calculated the Guidelines in the same manner as the parties, and recommended no term of imprisonment, three years of probation, and a $5,000 fine. The Probation Office's recommendation was based on, among other things, the defendant's lack of serious criminal history, his financial situation at the time he committed the offense, and absence of out-of-pocket losses to victims.

On September 1, 2022, the defendant filed his sentencing submission, asking the Court to impose a sentence of time served with no period of probation and no financial penalties. (Def. Mem. at 2.) The defendant based his request on, among other things, the defendant's age, his lack of serious criminal history, the financial and emotional impact that the COVID-19 pandemic (and this case) has had on his family, and his compliance with pretrial conditions.

## III. Discussion

### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent the Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" *United States* v. *Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall,* 552 U.S. at 50).

**B. A Term of Incarceration Within the Stipulated Guidelines Range is Appropriate**

The Government respectfully submits that a term of incarceration within the Stipulated Guidelines Range of zero to six months and a fine would be appropriate.

*First*, this was a serious offense, and the defendant's punishment should reflect that fact. The defendant sought to capitalize, through deceptive and unlawful means, on a public health crisis. While COVID-19 was ravaging the New York area and public health officials urgently sought critically needed PPE for first responders and health workers, the defendant (with no experience in the provision of PPE) tried to get rich quick. He did this through various means. First, the defendant obtained access to large quantities of PPE and attempted to sell the desperately-needed equipment at outrageously marked-up prices—in the case of the FDEM, an 1,100% mark-up. Second, the defendant attempted to secure a $45 million contract from the the City for 3M-brand PPE that he had no realistic ability to fulfill. In doing so, the defendant made numerous false statements and representations. He lied about his affiliation with 3M. He lied about his ability to obtain 3M productions. He lied about his history of selling PPE. And while the defendant's scheme ultimately failed, the City expended employee time and resources during a period of unprecedented crisis when resources could have been focused on legitimate vendors. Third, in the case of the Medical University, the defendant misrepresented the product that he was able to supply and initially rebuffed the university's requests for a refund.

The defendant's conduct was not the product of a momentary lapse in judgment. The defendant began devising the scheme before COVID-19 became a crisis in the United States. And he was repeatedly warned by others about his conduct. For example, when CC-3 first saw the defendant's pricing, CC-3 wrote in an email to the defendant, "WOW!! I just saw the prices. They are outrageous on a per mask basis." Later that day, CC-3 sent the defendant another email, "Look, I really have a problem with the pricing. . . . I feel like the prices you have sent me are taking advantage of people." About a month later, CC-3 emailed the defendant, "I just heard from someone who knows well that anyone caught selling masks at or about $6.50 will face an FBI investigation." And on March 22, 2020, while watching a White House press conference on the Defense Production Act and price gouging, the defendant recognized the illicit nature of his conduct, texting a co-conspirator, "Trump press conference not promising for us." The defendant's conduct lasted several months, and he knew his conduct was wrong. But at each juncture, he chose to continue in the hopes of lining his pockets.

*Second*, a sentence within the Stipulated Guidelines Range is necessary to promote respect for the law and deter others from similar conduct. COVID-19 will not be the last public

emergency. And the defendant will not be the last opportunist to exploit a crisis. The Court should send a clear message that unlawfully capitalizing on public crises for personal gain has serious consequences.

The defendant raises several mitigating factors that the Court can and should consider. None of the facts, however, justifies the sentence the defendant seeks.

The defendant contends that he "panicked" and "was not prepared for the devastating impact the COVID-19 pandemic would have on his livelihood." (Def. Mem. 5.) While the COVID-19 pandemic no doubt caused financial hardship for the defendant and his family, as it did for so many individuals and businesses around the world, the defendant began the scheme long before he (or any of us) could have felt or predicted the calamity brought on by COVID-19. The defendant and his friend, CC-2, began their efforts to secure PPE by February 2020. And the defendant formulated his predatory pricing no later than March 2—before there were shutdowns in the New York area and the financial impact of the pandemic could have been felt. Moreover, as compared to many others, the defendant appears to have enjoyed a favorable financial status—he earned an annual salary in excess of $100,000, he resided in a house worth nearly $1 million, and he raised well-educated, accomplished children. (PSR ¶¶ 144, 149, 152.) The defendant did not act out of desperation. Rather, he saw an opportunity to take advantage of the desperation of others.

The defendant argues that the time he has spent on pretrial supervision is sufficient punishment. (Def. Mem. at 3.) While defendant's conditions of pretrial release, which were minimal, may have been inconvenient, they were in no way punishment and are not a reason to deviate from a Guidelines sentence.[3] *See United States v. El–Hage*, 213 F.3d 74, 79 (2d Cir. 2000).

The defendant also argues that he faces state criminal tax charges stemming from an investigation that started after the charges in this case were unsealed. (Def. Mem. at 6.) To the extent the defense contends that the defendant's alleged failure to pay nearly $400,000 in taxes to New Jersey taxing authorities is somehow mitigating, it is not. The separate and unrelated criminal tax case should not be a reason for leniency here.

[3] The Court ordered standard conditions of release: surrender travel documents, pretrial supervision as directed, no possession of firearms, unsecured personal recognize bond. (Dkt. No. 3). The Government notes that, while on pretrial release, the defendant was permitted to travel to Italy. (Dkt. No. 61).

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a term of incarceration within the Stipulated Guidelines Range and that the Court impose a fine.

Respectfully submitted,

DAMIAM WILLIAMS
United States Attorney for the
Southern District of New York

By:____/s/____________________
Nicholas W. Chiuchiolo
Timothy V. Capozzi
Assistant United States Attorneys
(212) 637-1247 / 2404

cc: Todd Blanche and Elizabeth Moore, Esqs.